THOMAS, Judge, concurring in part and dissenting in part.
In November 2014, T.G.F. ("the mother") filed a petition requesting that the Monroe Circuit Court ("the trial court"), among other things, terminate the visitation of D.L.F. ("the father") with the parties' child, who was born on October 12, 2010, because, she alleged, the father had sexually abused the child. In June 2015, the mother filed an amended petition in which she also alleged, among other things, that the father was in contempt of an earlier judgment for failing to pay certain expenses for the child. In December 2014, the father filed an answer and a counterclaim in which he, among other things, requested that the trial court award him sole physical custody of the child.
The trial court thereafter conducted a trial and entered a judgment on March 24, 2016, denying, among other things, the mother's requests and permitting the father to have unsupervised visitation with the child. The mother timely appealed the trial court's judgment to this court, and the main opinion reverses the trial court's determination regarding the father's alleged contempt and remands this action for further proceedings on that point. I concur with the main opinion's resolution of that issue for the reasons discussed therein. The main opinion also concludes, however, that the evidence presented at trial was sufficient to support the trial court's award of unsupervised visitation to the father. I dissent as to that issue.
On appeal, the mother argues that the trial court's judgment should be reversed, in part, because its award of unsupervised visitation to the father does not adequately protect the child's safety. I note that, although the mother's petition sought complete termination of the father's visitation and did not alternatively request supervised or restricted visitation, the following exchange took place at trial between the trial court and the mother's attorney after an evidentiary objection from the father's attorney regarding the relevance of certain testimony:
"[The trial court]: Ultimately the issue in this case that you're asking me to decide is to terminate his visitation-is that right?
"[The mother's attorney]: Well, I'm asking [that] it be supervised, that it be limited-that it be restricted.
"[The trial court]: That it be permanently restricted pending further orders of the Court?
"[The mother's attorney]: Yes, Your Honor. That's what we're asking.
"[The trial court]: ... I will overrule, but let's don't go far afield of what the ultimate issue is in this case."
Furthermore, the mother later testified: "I'm asking for continued supervised visitation." The father's attorney did not thereafter object to the parties' trial of the issue of restricted or supervised visitation.
"According to our rules of civil procedure, when an issue not raised in the pleadings is tried by the express or implied consent of the parties, the issue must be treated as if raised in the pleadings. See Rule 15(b), Ala. R. Civ. P. In this case, the father did not object to the testimony concerning the issue of [supervised or restricted visitation]; therefore, the issue was tried by the express consent of the parties and the judgment is not void."
*229 McCaw v. Shoemaker, 101 So.3d 787, 798 (Ala. Civ. App. 2012).
Relying on the ore tenus rule, the main opinion concludes that the trial court's award of unsupervised visitation to the father should be affirmed. " 'Under the ore tenus rule, the trial court's findings of fact are presumed correct and will not be disturbed upon appeal unless these findings are "plainly or palpably wrong or against the preponderance of the evidence." ' " Bittinger v. Byrom, 65 So.3d 927, 930 (Ala. Civ. App. 2010) (quoting Shealy v. Golden, 897 So.2d 268, 271 (Ala. 2004), quoting in turn Ex parte Cater, 772 So.2d 1117, 1119 (Ala. 2000) )(emphasis added). Black's Law Dictionary defines "preponderance of the evidence" as:
"The greater weight of the evidence, not necessarily established by the greater number of witnesses testifying to a fact but by evidence that has the most convincing force; superior evidentiary weight that, though not sufficient to free the mind wholly from all reasonable doubt, is still sufficient to incline a fair and impartial mind to one side of the issue rather than the other."
Black's Law Dictionary 1373 (10th ed. 2014).
The mother testified that, before she filed her petition in November 2014, the child was four years old and that the child had begun resisting visitation with the father at that time. Specifically, the mother testified that the child had been crying, irritable, wetting the bed, and "clinging" to the mother. She recalled that the child had been exhibiting such behavior the night before the mother filed her petition and that she had asked the mother to sleep with her, which the mother said was unusual. She said that, before the events of that day, her relationship with the father and the child's relationship with the father had been positive for a time. She also stated, however:
"This particular day when she disclosed information to me has changed-everything changed. I was in a situation that we need to find out what was going on with her, I want her to be healthy. I want her to be protected."
The mother testified that she contacted the Monroe County Department of Human Resources ("DHR") the next morning and filed her petition that day. The mother testified that the child had told her that she had seen certain photographs while in the father's care that the mother was concerned were pornographic.
When the mother contacted DHR in November 2014, she was instructed by DHR to take the child for a physical examination and for an evaluation by Niki Whitaker, the executive director of Baldwin County's Child Advocacy Center. She stated that the physical examination had not uncovered physical evidence of sexual abuse. She testified that DHR had given her no additional instructions, but she had taken the child to Dr. Bridget Smith for further evaluation and treatment. The mother testified that she had taken the actions summarized above to protect the child.
Jane Agee, the caseworker who conducted DHR's investigation, testified that she had been unable to determine whether the father had sexually abused the child. Agee stated that she had witnessed Whitaker's interview and could not recall specific information about what had transpired during the interview. She stated, however, that when asked if someone had told her what to say during the interview, the child responded that the mother had. Agee stated that, although she could have referred the child for an extended forensic interview, she had not done so because the father's visitation was supervised at that time and there were therefore no concerns *230 for the child's safety. She testified that she had no opinion regarding whether the child would be safe if the father was awarded unsupervised visitation.
Whitaker testified that she had had concerns after her interview with the child: "My concerns were because she did indicate some things had happened, and she also strongly indicated she did not want to be [with the father], and she gave examples of things that made her not want to be [with the father]." She further stated that the child had brought with her to the interview a toy cat and a baby doll. When asked what the father had done, the child demonstrated with the toys that the father had touched her inappropriately using his fifth finger.
Whitaker also stated that, if the mother had told the child to tell the truth during her interview, that would have been an appropriate instruction for the mother to give the child. Regarding her conclusions, Whitaker stated: "I felt like there was more to be done. I don't think I could rule in or rule out sexual abuse based upon the one interview that was conducted." She said that, based on her evaluation, she had informed Agee that she could provide an extended forensic interview of the child, but, she said, DHR had not referred the child for that service.
Whitaker testified that she had spoken with Dr. Smith after Dr. Smith had interviewed the child. She noted that many of the child's disclosures that Dr. Smith recounted were similar to those that the child had made to her. She stated that she believed that the similarities between those disclosures had increased the child's credibility. When asked whether she had any concerns with the father being awarded unsupervised visitation, Whitaker responded:
"I don't know what happened from my interview to present, I don't know if there's other information that was obtained. But based upon my interview with the child, yes, there were concerns."
Dr. Smith testified that she was a licensed psychologist who had "been serving children and adults for over thirty years." She stated that she had testified as an expert witness "[p]robably close to a hundred" times. Dr. Smith had observed the child during several sessions, over the course of approximately "ten clinical hours," beginning in April 2015. Dr. Smith said that she was concerned for the child's safety based on the allegations that the child had made. Dr. Smith testified that the child had told her on multiple occasions that the father had "sexually touched her in the vaginal area."
Regarding the manner in which the child had made those allegations, Dr. Smith offered the following testimony upon direct examination by the mother's attorney:
"A. On the incomplete sentence blank, she disclosed that she was being asked to keep a secret. When I asked her what the secret was, she took a doll and she put her finger in the vaginal area. On another occasion, after we read the book, and I asked her if anyone ever made her feel uncomfortable, she said her father made her feel uncomfortable-she refers to him as Daddy-and she squatted and put her finger on her own vaginal area.
"Q. Did you ask her to do that?
"A. No.
"Q. You said that she was being told to keep a secret. I didn't hear you say who was telling her to keep a secret.
"A. I did ask her who told her to keep a secret, and she said her daddy.
*231 "Q. You talked about she made a disclosure on the incomplete sentence blank. What is that?
"A. It's a series of questions-well, they're sentence stems, and so the child is asked to just complete it with what they think or feel, so the stem might be, I would like to or my daddy is or boys are. They're very open ended. Children can answer them in pretty-whichever way they feel like answer them. And I asked her the stems, and then I write down the responses.
"Q. And do you know what she said?
"A. Yes. There were several that were of concern. The specific concern was-the stem was I get mad when, and I said-she said, I get mad when Daddy. And I said, why Daddy? And she said, because Daddy told me to keep a secret. That's when I followed up on the question about secrecy.
"Q. Dr. Smith, is it typical for abused children to love the abuser?
"A. Absolutely.
"Q. Is it typical for abused children to have a desire to see the abuser?
"A. Yes.
"Q. I'd like to ask you, Dr. Smith, if a mother told a child that were coming to see you, for example-tell Dr. Smith the truth, tell Dr. Smith what you told me. Is that appropriate or inappropriate instruction for matters such as this?
"A. Appropriate."
She also offered the following testimony regarding the child's behavior during their sessions:
"A. She did several drawings that I think were highly significant clinically. For example, she refused to draw herself on the picture with her father and stepmother. She drew pictures which she identified herself as sad when she did draw a picture. When I asked her to draw a picture of her father, she drew her sad and him angry. Spontaneously, she drew another picture on her own of her father with a very angry-looking face. She said he was angry. And it is an unusual drawing that is actually quite phallic looking as far as the drawing. And then when she disclosed-after several disclosures, I drew a stick person of a man and asked if she had ever seen a man's private parts, and she said, yeah, she had seen her father while he was going to the bathroom, but no other connotation. And when I drew a stick picture of the little girl, I asked if anybody had ever touched her or made her uncomfortable and I had the pink marker in my hand and she said she wanted the marker to be red because she was upset and hurt, and she drew a picture-she touched the knee, and then she drew a circle around the hip, and then she drew an arrow to the vaginal area. When I asked her [for] more disclosure, she talked about where her father had touched her and how uncomfortable and scared it made her.
"Q. Did she tell you how he touched her in her private area?
"A. With his hand.
"Q. Do you know if he put his hand inside of her vagina?
"A. I don't know.
"Q. Is it typical that children whose vagina has been touched by a parent would reflect no physical evidence?
"A. Yes, very typical."
She also specifically stated:
"A. When you're evaluating children for allegations of abuse, different types of responses have more salient value. So a spontaneous disclosure-if the child makes that is considered to be highly significant. The second level would be indirect questioning, and the third would *232 be direct questioning. As you become more direct in your interview style, then you have to be very careful to make sure you're not influencing the child. So spontaneous disclosures are considered the most important.
"Q. And in this case do you know how many spontaneous disclosures that you had?
"A. Four times.
"Q. And when you testified earlier about her squatting and on her own body putting her finger at her vagina, was that spontaneous?
"A. Yes.
"Q. How credible is that? In your mind?
"A. Highly significant, credible, yes."
Dr. Smith testified that she did not believe that the child had been coached by the mother and that she had observed no indication that the child's allegations had been fabricated. She stated that, in her professional opinion, the "clinical data support[ed]" the conclusion that the child had been sexually abused by the father and that she believed that the father's visitation should remain supervised.
The father denied that he had sexually abused the child. He testified that his relationship with the mother had been troubled at least since the child's birth and that they had separated only a few days after the child's birth. He opined that the mother had alleged his sexual abuse of the child in an effort to erase him from the child's life, but he conceded that there had been a period wherein their relationship had improved and that they had participated in joint activities with the child during that time.
After a declaration from the trial court that, because the father was seeking a custody modification, "everything [wa]s pretty much relevant with regard to his character and her character," the father testified that he had been discharged from the Navy because he had been diagnosed with a personality disorder. He stated that he had been prescribed medication both for the personality disorder and for depression. He elaborated upon his conditions during cross-examination by the mother's attorney:
"Q. Do you take any of your medications anymore?
"A. No.
"Q. Why not?
"A. I don't need them.
"Q. So you have been prescribed medications for your personality disorder and your depression, isn't that correct?
"A. I have.
"Q. And you have a long list of medications that you have been prescribed, right?
"A. At one time, yes.
"Q. And what were those?
"A. Just mainly anti-depressants, Zoloft and Effexor and things like that.
"Q. Wellbutrin ?
"A. Yeah.
"Q. Lexapro ?
"A. I'm not sure about that one.
"Q. Was there a list of about ten medications you've been prescribed?
"A. I guess.
"Q. And you just decided-even though your doctor prescribed them-prescribes them for you, you just decide on your own that you don't need them, right?
"A. Yes.
"Q. So you have suffered from depression since the eighties; is that true?
"A. That's true.
"Q. And you still maintain that you just-you discontinued your medications *233 even when the doctor thinks you should take them, right?
"A. Yes.
"Q. That's just a decision that you make on your own?
"A. If you don't have a headache, you don't take an aspirin.
"Q. So, in addition to-let me ask you. Do you still take prescription medications like Lortab that you get from your father or other sources?
"A. No.
"Q. Can you pass a drug test?
"A. Yes.
"Q. So you have stopped taking other people's pain medication?
"A. Yes.
"Q. When did you stop that?
"A. When I realized it was wrong.
"Q. When was that?
"A. During your deposition.
"Q. So you haven't taken anymore illegal drugs since then?
"A. Never."
Regarding certain sexual activity and whether he had exposed the child to such activity, the father offered the following testimony during cross-examination by the mother's attorney:
"Q. Let's talk about pornography. Do you still engage in pornography; do you still view it?
"A. No.
"Q. Isn't it true that you sent pictures of your penis over the e-mail to your girlfriend?
"A. I did.
"Q. And isn't it true that she sent pictures of her pleasing herself, masturbating to you on your phone?
"A. Yes.
"Q. So did you give your phone to the police officers?
"A. I offered it.
"Q. That's a yes or no. Did you give it to them?
"A. No.
"....
"Q. The pornography-did you-the pornography that you were viewing-you masturbated while you viewed the pornography; isn't that true?
"A. I have in the past.
"Q. And you don't do that anymore either?
"A. No.
"Q. When did you stop that?
"A. I don't know. A year ago, year and a half.
"Q. All right, so up until the time she was, say, three and a half-up until [the child] was three and a half years old, you still engaged in pornography, and you would masturbate while you viewed the pornography?
"A. Not when she was with me.
"Q. You would only do that when she was gone?
"A. Yes."
The father testified that he believed that Dr. Smith was "biased towards the mother" because, in his opinion, her testimony had been "ridiculous."
The main opinion "acknowledge[s] that the mother presented a great deal of evidence supporting her claim that the visitation should be supervised to protect the child from sexual abuse by the father" but nevertheless concludes that the trial court's award of unsupervised visitation to the father should be affirmed. 237 So. 3d at 225 (emphasis added). I agree that the mother presented a "great deal" of evidence supporting her claim, and I therefore conclude that the mother met her burden of proving that the father's visitation should be restricted or supervised.
*234 "While a trial court has broad discretion in determining visitation rights it will award a noncustodial parent, each such case requires an examination of the facts and circumstances of that individual situation. Andrews v. Andrews, 520 So.2d 512 (Ala. Civ. App. 1987). Additionally, the trial court's primary consideration in establishing visitation rights for the noncustodial parent must be the best interests and welfare of the child. Brothers v. Vickers, 406 So.2d 955 (Ala. Civ. App. 1981)."
Y.A.M. v. M.R.M., 600 So.2d 1035, 1036 (Ala. Civ. App. 1992) (emphasis added)(reversing a trial court's award of unsupervised visitation with the father when evidence was presented at trial indicating that the father had sexually abused the child). Furthermore,
" '[a] noncustodial parent generally enjoys "reasonable rights of visitation" with his or her children. Naylor v. Oden, 415 So.2d 1118, 1120 (Ala. Civ. App. 1982). However, those rights may be restricted in order to protect children from conduct, conditions, or circumstances surrounding their noncustodial parent that endanger the children's health, safety, or well-being. See Ex parte Thompson, 51 So.3d 265, 272 (Ala. 2010).' "
B.F.G. v. C.N.L., 204 So.3d 399, 404 (Ala. Civ. App. 2016) (quoting Pratt v. Pratt, 56 So.3d 638, 641 (Ala. Civ. App. 2010) )(emphasis added).
The mother presented evidence indicating that the child had, on multiple occasions, spontaneously disclosed that the father had sexually abused her. The father did not present any evidence indicating that the child had not, in fact, made those statements or providing an alternative explanation for the child's statements. Furthermore, in addition to Whitaker's testimony that she had been concerned for the child's safety, Dr. Smith testified that, in her expert opinion, the father had sexually abused the child. The only evidence offered by the father rebutting Dr. Smith's conclusion was his own testimony, wherein he denied having sexually abused the child and described Dr. Smith's opinion as "ridiculous." However, regarding the father's credibility, the undisputed evidence demonstrated that, despite having been diagnosed with two psychological conditions, the father had refused to take his prescribed medication based on his unilateral disagreement with the opinions of psychological professionals that he do so, and his testimony was therefore offered without the benefit of treatment that he had been advised was necessary for him to achieve appropriate psychological or behavioral functioning. The trial court's conclusion that the father's testimony outweighed the undisputed disclosures made by the child and the professional observations of Whitaker and Dr. Smith is not supported by the record.
Thus, the mother met her burden of proving by a preponderance of the evidence that any award of visitation to the father should be restricted in such a way as to ensure that the child's safety is protected, and the father did not adequately rebut the evidence presented by the mother such that an award of unsupervised visitation was warranted. Because I believe that the trial court's conclusion that it was in the child's best interest to award the father unsupervised visitation was against the greater weight of the evidence and against the evidence that had the most convincing force, I believe that the trial court erred to reversal, and I disagree with the main opinion's conclusion to the contrary.
The trial court's mistake in this case was failing to primarily consider the child's safety. When faced with a demonstrated *235 probability that a child has been sexually abused by a parent, any visitation award fashioned by the trial court in favor of that parent must reflect the priority that the law gives to the child's safety. Because the trial court's judgment failed to do so in this case, I would reverse the judgment insofar as it addresses visitation and remand this action with instructions for the trial court to order that the father's visitation be supervised or, alternatively, to craft a visitation award that adequately protects the child from the possibility of sexual abuse by the father-an order to which the child is entitled and that our courts are obligated to provide.